Commonwealth of Pennsylvania, Pennsylvania Game Commission v. Thomas C. Proctor Heirs Trust You may proceed. Thank you, Your Honor. May it please the Court, my name is Michael Scarrinci. I'm a Deputy Attorney General with the Pennsylvania Office of Attorney General. I'm here representing Appellant, the Pennsylvania Game Commission on this interlocutory appeal. I'd like to reserve three minutes with your permission. It's done. Thank you. As I stated in my opening brief, Your Honors, Pennsylvania's title wash law is complex and obscure. And I know that we've offered Your Honors a lot to read in this appeal, and a lot of that reading involves old and somewhat difficult cases. Therefore... Such great language, too, right? Just like when you start with title wash. You know, seeded and unseeded land. And cases that talk about William Penn's son's land distribution plans. This is... It's been... It is a lot to read. But in a weird, I'll confess, nerdy way, it's been an interesting case. It's a fun case. So go ahead. I agree, Your Honor. It's been a history lesson for all of us. It's for that reason that I want to focus on the District Court's two most critical errors. That being the lack of a separate assessment of the subsurface and the duty issue. And stepping back for just a second, I'd like to... When you say duty, you mean duty report? No, I mean duty to pay. Duty to pay, yes. And just stepping back for one moment, I want to place those two errors in an analytical framework. For a title wash to occur, there had to have been... The land had to have been unseeded. There had to have been no separate assessment of the subsurface. And that could have been for two different reasons. The county commissioners could have not been otherwise directed to assess the land, or they simply could have made an error. But the point is, the fundamental issue is how they assessed it, not whether they were told to assess it. That seems to me to be meaningful, because a lot of time and ink is spilled here about whether they were told, whether it was reported or not. From your framing of it, what you seem to be saying is, it's not that that's irrelevant, but that's not the legally critical point. Because whether they were told or not, even if they were told, if they even by mistake assessed it in the entirety, instead of separately as surface and subsurface, the effect of the tax sale would be a title wash. Have I understood the... Yes, that's right. That's absolutely right. What's dispositive is whether there was actually a separate assessment. Reporting alone is not enough. The county commissioners had to actually make the assessment, the separate assessment. And that's what Herder Spring teaches. There the court said, if the subsurface owners disputed the county commissioners' failure to assess their subsurface estate separately from the surface estate, they should have contested the assessment and tax sale within the initial two-year redemption period. In other words, it's a mere irregularity. If it's not challenged within two years, it's time barred. But if there is no value to the subsurface, if the subsurface hasn't been developed, there's no tax due anyway. So what is the need to assess the subsurface if the subsurface is not providing any value? I understand, Your Honor. And that gets more to the duty issue. But the answer to that is what matters is whether the assessment was done. And the county commissioners at Herder Spring and Bernard in 1972 and Wilson versus Cook in 1929 addressed that issue and said, what matters is whether there was the actual assessment. The lack of assessable value, what they said is the issue is not whether minerals had an assessable value, but whether the assessment addressed the warrant as a whole or merely the subsurface. In other words, if you think the property is worth zero, you have to tell that to the county commissioners. There's nothing like that here. In fact... So what does the record show here? Because we have a finding of fact by the district court after a bench trial that the county commissioners were told that the subsurface rights had been reserved. Why does the Commonwealth of Pennsylvania think that's a so what? It's a so what because Herder Spring, again, teaches how you make that determination. You have to look at the prior assessment and the treasurer's deed to see if anything less than the entire property was assessed and sold. In other words, there has to be some indication. There has to be a notation that says surface only or minerals only or gas only, and we see that with respect to other properties outside of Bradford County. When you say there has to be that kind of notation, you mean on the transfer or do you mean somehow in the tax records? So here would be the 1907 Bradford County commissioners assessment. That's at 452 of the joint appendix. And then you would look at the treasurer's deed. It would have to say something like surface only. Here it says it's in the name of the warranty owner, which is a strong indicator that there was no separate assessment. And in fact, the Proctor Trust, their own expert, said at a deposition that between 1890 and 1935, covering all the relevant years here, there had not been a separate assessment of the subsurface for any property in Bradford County. Does it make any difference at all that this appears to have been an engineered put-up job? That this was in fact an effort by those earlier owners to deliberately divest the Proctor Trust of the subsurface rights that they'd reserved? In other words, that there was nefarious action here and that you now, the Commonwealth of Pennsylvania, are claiming the benefit of a fraud. That's the pretty clear statement that's being made, maybe not precisely in those words, but from the other side. I understand. And it doesn't matter. Powell put his blessing on this and said that this is a common remedy for perfecting title. And Proctor knew that best, because his companies did it all the time. That's recounted in two of the articles I cited, Shale Gas and Boctor from a 1960 Dickinson Law Review. And so, I mean, Proctor has that kind of timing. No, I'm thinking of the wrong case. But the one thought I kind of want to get at here is this. Let's just say that we say that the commissioners did know, right? And then they just, they messed up by not doing the separate assessment. What you're saying is, now, if I tease this out, it's an in-rem parcel. And so by in-rem parcel, the notice that goes out is by publication, right? And so we get to this really weird point of, is that notice, I mean, notice by publication is usually sufficient. But here, if you tell the commissioners that you own it, you aren't expecting them, who are very powerful at this point in the Commonwealth's history, to not do the separate assessment. And so is the notice by publication sufficient in that instance? When you sit there and say, I gave you the info, you did something different with it. Now you publish that you're doing something I have no reason to check any publication for, because I gave you the info. So in that question, in that instance, I mean, Herder Springs had a little bit of a discussion of Mullane and other things like this. But isn't even under Mullane that a problem? Your Honor, there's no question here about constitutional due process. There was no finding onto that. There's no legal question as to that. And I would just point out, it's not that Proctor reported. What the district court found is that apparently Union Tanning may have reported. We don't know exactly what the reporting is, because the evidence of the direct reporting is not in there. The district court made an inference based on the township record saying, assess to Union Tanning. So that would be my answer to your question. And Judge Jordan, I wanted to finish answering my question to you. There's nothing inequitable about this process, because there's many ways that Proctor could protect themselves. I can actually count five, Your Honor, if you'd let me go through them. Please do, because when you say there's nothing inequitable about it, it looks like CPLC set out to stick it to Proctor. What about the rule that the person who fails to pay tax cannot then, through a tax sale, wash the title? Yes, Your Honor. And I want to answer both Judge Jordan and Judge Roth. Get to the Powell rule, but you can answer what you want to get at first. Okay. So my answer to you is there's five ways for a surface, for an owner to protect himself. He can have a separate assessment, and then he pays the taxes. He's protected. He can ensure that the taxes are paid in their entirety on the property. Cannot pay the taxes. You're rolling pretty fast, Mr. Grint, is what you say. He can pay the taxes. The district court's finding of fact is they did what they were supposed to do. They told the county commissioners. They made the report they were supposed to make. And there was no tax to be paid is the implication, because nothing had been developed. So I'm not sure how that advances the ball of saying, well, this is a fair and equitable way to happen, because the district court's finding is they did what they were supposed to do, and they're still taking it in the back. There's a lot in there, Your Honor. And again, I would just point out it wasn't Proctor that reported this. Apparently, Union Tanning, I think, was the finding. So it wasn't anything that he had done. If I could just have a second here. Besides paying the taxes in their entirety or ensuring that they're paid, even if the property's not separately assessed, there's still taxes on the property, and they have to be paid. Now, either owner can pay it. They can work out an agreement, but somebody has to pay it. And if it's not, then it goes into default, and there's a tax sale. And again, anybody could have showed up at the tax sale. They're always held on the same year under the law. Proctor's heirs could have showed up at that time and purchased the property. They could have challenged this irregularity within two years. It comes down to the Herder-Spring statement about harsh but diligent landowners are okay. I mean, when you come down to it at the end of the day, it feels like the Commonwealth's argument is purely and simply, hey, you've got two years to do this, and if you're not paying attention, that's too bad for you, right? Yes. There's a balancing of rights between prior owners and tax sale purchases. Prior owners have ways to protect themselves, but at some point, the law says you've had your chance, and now these other owners are building up the property. They've made improvements. It would be an injustice to them to now give it back to the other person, the prior owner. And the Powell Rule means what? Judge Roth has asked you specifically, doesn't Pennsylvania law want to take account and in fact take account of that by saying you can't, like if you're the bad actor, you don't get to take advantage of that? What the Powell Rule says, and what Judge Conner held here, is that CPLC through McCauley, Jr. owed a duty to the state. Right. And he cites the June 1887 Act. Right. He cites Breach v. Cox and Mayer v. Riddle and McCoy v. Mitchell. He's got a whole series of cases and statutes where the court and the legislature speak in terms of the payment of taxes being a duty. And I'm going to explain those all to you, Your Honor. We have to start with Heard of Spring. And Heard of Spring goes back to Powell and says, in Heard of Spring, Powell explained the duty or lack thereof of landowners to pay taxes. And what did Powell say? Powell said neither owner is under any obligation to the state to pay taxes. Now, as you said, McCoy v. McHugh, that's cited in Heard of Spring. But if you read that case very carefully, that is a case about duty to report, not the duty to pay. Like so many of these cases that are cited by Proctor and by the district court at pages 30 to 31 of their brief, these cases are distinguishable. They do not involve the legal issues here. Breach v. Cox is about actual payment or tender of the payment before the tax sale. So if you paid the taxes ahead of the tax sale, of course, the county commissioners couldn't sell it later. That would make the sale void. If you look at Baird v. Cahoon, another case, that's the same issue. Riddle is about adverse possession. Miller is about a misdescription of the warranty deed. None of those are on point here. All right. Now, let's just assume for the sake of discussion that we believed you were correct about all that. I want to shift gears for a moment where we'll pass your time for a practical question, which has been much on my mind. Sure. The very same parties are in front of the Commonwealth Court and have been in front of the Supreme Court on a different tract of land, but involving, as far as I can tell, precisely the same legal issues. This is a question of Pennsylvania law. Absolutely. And yet the Commonwealth Court has evidently asked the parties whether it should stay and wait to hear what we have to say about it. Right. Why should we say anything about this when the parties are before the state courts? They've already invested time in it. In some instances, it looks like substantial time. And indeed, the Supreme Court of Pennsylvania itself has invested time in addressing these parties on the same legal issues. Why shouldn't we say, hey, we're not doing a thing with this until you guys, you wonderful state court colleagues, whose law is at issue, address it? Yes. I understand that point. I think Mr. Dempsey is going to address that at length, but I would also like to address it. And my answer is this. I think if we had thought that the law was unsettled here, we would have asked the Pennsylvania Supreme Court, we would have asked your honors to certify it to the Pennsylvania Supreme Court right away and seek their guidance. Now, Judge Conner found some distinctions in the law. Now, as I've said, I think those are insignificant. But if your honors think that potentially these are significant differences, then yes, I think by all means, you should seek guidance from the Pennsylvania Supreme Court on these issues. Should we just hold off on this litigation until the Pennsylvania litigation is completed? Yeah. Why would we certify this? It's going to come in front of the... If there's one thing that's sure, based on the history here, neither side is walking away from this. I should say that. Maybe you'll get together, you'll settle this up, the whole thing will be done. But short of that, the Pennsylvania Supreme Court is going to answer this question because no matter what the Commonwealth Court says, it's going up, right? I think so, yes, your honor. So I see your point, and my answer is still, I think the law is clear, but I understand if you, like Judge Conner, see there's some kind of nuance. We don't think those are significant, but of course, I understand your reticence and your willingness to be deferential to state law. Well, you know, the Herder-Springs case kind of had this dispute about, or this Chief Justice Todd, I think, at the time, wrote separately to kind of talk about the Mullane issue, and I'm not sure that that was fully teased out, but from what I understand, Mullane stands for the proposition that notice by publication is an acceptable due process form in cases where the person is missing or unknown. And if we have a case here, and they didn't address that issue in detail, they just said Mullane is retroactive, but they didn't address the scope of Mullane. And so if we have a finding here, that says there was notice, and the notice was actually who owned it, then we don't have a Mullane problem anymore, and service by publication, and the in rem mechanism of doing service by publication might not, for Title Watch, might not work once there has been a report made, and we have a district court finding that you point out correctly. I think it was based on inference, but it's a finding, that the commissioners had notice. So once they had notice, I don't know that service by publication is available to them. As a way of announcing that the Title Watch, even though it appears on the same day every year, or every two years maybe, but, and so if the notice is deficient, then the Title Watch is not going to work. The Title Watch is deficient, too. That's how constitutional law works. Your Honor, there's no due process issue here before the court. That issue hasn't been briefed by the party. So like Justice Todd said, the answer has just been waived. So in this Bellwether case, issue for later, but... Yes, this is a Bellwether track, so I mean... So maybe an issue for the next case to become a Bellwether case, but not this case. Not on this interlocutory appeal. It's not an issue. We do get the ability to address things more than just what the certification is. We aren't stuck rigidly with the certification. What we're saying is this is too different. Absolutely. You're not, you review the order, not the opinion, but again, this issue is not before the court. Your Honor, you also brought up the Act of 1887. I would like to address that for just one moment, if I may. I know my time is up. Or I could come back and rebuttal and address it, if you'd like. 30 seconds. Tell me about that. That is elephant in a mouse hole. That Act is about a statutory interest rate of 6%. Remember, these tax sales are every two years. So after one year, if you haven't paid your taxes, you pay a 6% interest on that, correct? That is not about overturning 80 years of statutory and case law. I mean, this Act from 1887, Powell and Herta Spring don't mention it at all. It was not overturning existing case law. It's, you know, they used shell pay. That is the legislature talking in plain English as opposed to all the legalese I've been talking about, Your Honor. I'm happy to wait for rebuttal. Thank you. Go ahead. You may proceed. Thank you, and good morning. May it please the Court, I'm Jack Dempsey. I represent EQT AMD and EQT ARO, both participating as amicus with leave of court. The certified question before the Court has been decided by the plaintiffs. I would like to use my brief time, though, if I may, the permission from the Court to participate today was with a direction not to be duplicative, and I will do my best to avoid any duplication. And so I would like to spend my time discussing who my client is and why the issue is of concern. Why are we participating as amicus? And then second, I would like to spend my time discussing who my client is and why the issue is of concern. And then third, I would like to raise an issue of federalism that Judge Jordan, that you touched upon during my colleague's argument. And if I may, 31 days after Judge Conner reversed his prior opinion in this case, so 31 days after his April 2020 opinion, the Proctor heirs sued my client and another co-owner of 17,000 mineral acres covering 40 acres. They sued us in the same federal court. They marked the case related to Judge Conner's case, and in the process seek to upset title to 17,000 mineral acres. Now, they filed the lawsuit 120 years after the mineral reservation at the heart of the issue. They filed the case 120 years after the Powell versus Lancy decision, and four years after Herder Springs, but 31 days after Judge Conner made his decision. It would hardly be surprising, Mr. Dempsey, because 120 years ago, the subsurface rates were of either no value or had no present value. Nobody's running around spending their time paying attention to what's happening to something that appears to have no value. But now everybody knows there's real, you know, there's Marsalis shales in them, their halls, hills, and they're paying attention. They're serious about it because there's real money at stake. So I guess I'm not, I'm not moved or surprised by lack of attention for many years and by quick attention now because real money's on the barrel head. Go ahead. It's a fair point, and it's a point that's recognized candidly by the Pennsylvania Supreme Court and Herder Springs very expressly. And I think that's true. But what's also true is that the Pennsylvania Supreme Court spoke to the question of duty, the certified question before the court in Powell versus Lancy 120 years before the lawsuit was filed, and that case hasn't changed. And that case didn't produce this action. What produced the action was Judge Conner's opinion within 30 days. And to your point, Judge. To the federalism point, right? Because that's your time. Yeah, to the federalism point. And it's an important point, I think, for this court that there is a former leader of the court, Judge Sloviter, while she was chief, wrote in 1992 a law review article that expressed that there's an incompatibility between federalism and diversity jurisdiction, where federal judges predict how the state is going to act. And I think that's important. And it's not a question that the state court might decide. It gets dangerously close and oftentimes into policy determinations that are the province of the Pennsylvania Supreme Court. But what if we thought this is a clear case, like Mr. Scrantzy said, Herder Springs says what it says, nothing confusing about it. It just is what it is. And in fact, Commonwealth wins, which means by law it's a clear case. And by implication, you folks would win under our view of the law. What's incompatible with federalism and diversity jurisdiction, which has existed for centuries, if we say, hey, we're just applying settled law here, done? Nothing is incompatible, Judge, in that instance. And that is the obligation of the federal judiciary in a diversity case, to take the clear law of the Pennsylvania Supreme Court. We share the view of the Commonwealth, that Herder Springs and Powell clearly decide the duty question that's been certified in this court, and that the court, therefore, should reverse on that basis. What if we thought, you know what, the Powell rule is pretty clear, and therefore, the Commonwealth loses, and by implication, so do you. Are you ready to accept that just as well? Or would you say, well, we're going to pursue this with vigor in the state courts because they've got it wrong? Yeah, I'm confident the issue is going to be pursued with vigor in the state courts, Your Honor, which is part of the concern on the federalism question. And what I would say as to the record in this particular proceeding, there were effectively multiple decisions on this question in the district court. Magistrate Judge Schwab, in February of 2019, recognized that Powell and Herder controlled, and that there was no duty. And Judge Connor initially did as well. We're with you. We know the procedural history. Okay, thanks very much, Mr. Dempsey. You realize that that's Judge Sloviter in the portrait? I do, I do. Yes, right. Okay, thanks, sir. We'll hear from counsel for the Thomas E. Proctor Heirs Trust. May it please the court. My name is Laura Lange, counsel for the Thomas E. Proctor Heirs Trust. The district court correctly determined that the Central Pennsylvania Lumber Company had the duty to pay taxes, and that decision should be affirmed for three reasons. First, decades of decisions from the Pennsylvania Supreme Court provided that the unseeded landowner had the duty to pay taxes. So Herder-Spring just got it wrong? Herder-Spring didn't address the duty issue. It discusses, at different points in time, the lack of personal liability for an individual. But as our position makes clear, and as Judge Connor found, the difference between lack of personal liability and having a preexisting duty to pay the tax are two different things. How as a legal matter do you pull that out of Herder-Spring? When Herder-Spring says, as it does, the act did not impose any duty on the county commissioners to obtain information. It says, quoting the Morton case, a vigilant owner has nothing to fear. All he has to do is pay his taxes, and this he is bound to do upon every principle of equality and justice. In other words, you're not going to have to worry about all that, because under our rules, if you're paying attention, you're paying what you need to pay, you don't have to worry about it. You're all set. And I agree. The quote you just used actually holds that there is a duty of the landowner to pay his taxes to avoid the remedy of the county selling his property. And what Herder-Spring was really focused on was the Act of 1806 and the duty to report under the Act of 1806. And it dealt with a bona fide third-party purchaser. The duty to pay never came into play, because... Herder-Spring, it's undeniable that that is the most recent and comprehensive statement on all this, and it's from the highest authority with the authority to speak on Pennsylvania law, right? Correct. Okay. So when it talks about title washing, and it focuses, as it appears to, on a tax sale and whether or not the things were separately or by the entireties, when I say the things, I mean the subsurface and the surface rights. When it says that's the key, well, maybe I should just ask you, does Herder-Spring not indicate that that's the key question, whether it was taxed in the entirety or separately by subsurface and surface rights? That's the key issue. The key issue is whether reporting occurred, because the assessment is based... It's where the court says that the assessment is based on what was reported by the owners. I'm trying to find the exact... So at page 40 of our brief, but in Herder-Spring, we have a quote that says that because a tax sale conveys the property covered by the assessment, and that's Herder-Spring at page 375 of the Atlantic Reporter, and then where we discuss on page 41 it being relevant. So the Herder-Spring court explained that whether a severance transaction was reported is, quote, relevant to determining the interest conveyed by the ensuing tax sale, quote, because the county commissioners were tasked with assessing unceded property for taxation purposes based on what was reported by the owners. So if the owners go and report the severance, then the county is aware of it, and they have the obligation under the law to assess according to ownership. So your assertion is that Mr. Scrincy's point is just flat wrong, that if it's reported and the county does it wrong and keeps assessing it in the entireties, and then there's a sale, there's no title wash, because the fault is the county's, and you think Herder-Spring stands for that? Yes, I do. In Fisk v. Corey, which we cite in our brief, it discusses the county's failure to separately assess separately owned tracts. In that case, we're not dealing with a... What of all the reliance interests that Herder-Spring seems to be emphasizing and talking about when they say, look, this might be harsh, this title wash stuff, but if you're paying attention, you don't have to worry about it? Why would they bother saying that, that it was harsh, if that wasn't in fact the effect of... said to the county, hey, we have two separate ownership interests here that need to be assessed by their owners. And because of that fact, then by default the county's going to assess the whole. So if you just imagine, the county is assessing these properties by default, and prior to that severance, the whole estate, the surface and the subsurface, is one assessment. Until they are informed otherwise, they're going to keep doing that, regardless of whether there's a deed recorded. And that's what Herder-Spring holds. And third-party interests are irrelevant. It could be the case that for decades and decades and decades, somebody can think they own full title because there was a title wash. That's their understanding. And out of the woodwork can come a subsurface purported owner, when there's finally money involved, and say, you know what, it's really ours. That's, in your view, that's all meaningless. Well, in this case, that is not the circumstance. Following the post tax... Take my statement. Your legal position is that those third-party interests are irrelevant. It doesn't matter because 120 years ago, a county commissioner got it wrong. Somebody told them they got it wrong. They kept getting it wrong. At some point, 50 years after that, there was a sale. And everybody since then has believed it's all one thing. But now, there's too bad. I think what you just said right there is a critical factual determination, what the parties believed. Whether there really was a reliance standard. In this case, there was no reliance. In 1920... Stop and stick. You're moving back to your facts. I'm asking you whether it is not the case that your legal position makes reliance interests irrelevant. Because your position is, if there was notice, then it doesn't matter what people believed or didn't believe. Because you could have decades of reliance. It just is irrelevant because in 1890, some hapless clerk in, you know, Butner County or wherever, got it wrong. And it just doesn't matter. That's the legal position that Thomas Proctor Heirs Trust is taking. You still have to establish that reporting occurred. So, somebody's going to have the difficulty... Maybe what you're saying is... Hold on. This is just a yes or no question. Is that your legal position or not? Because it seems to be the legal position you're pressing. I don't think it's my legal position. I mean, if it were your legal position, that's not that different than the legal position that people take in any quiet title case. Right? Any time there's a quiet title case, one set of people thinks that they own it. They've been relying on the fact that they own it. And then there's another set of people that says, you thought you owned it. You thought you did. No, I want a quiet title. What makes this one really troubling is that it now has become... It's really old. And there's a lot of money in play. And so, at one level, that takes the reliance interest that might be present in any quiet title action and really exacerbates them to the point that it's a very, very, very big deal. The magnitude of that is huge. Coupled with this error, possibly, between receiving the report and not making the separate assessment. And so, I guess, even if you just embraced Judge Jordan's answer and said, yes, we say reliance doesn't matter, you've still got this magnitude problem, or at least the appearance of a problem, between a glitch and a colossally different outcome. And so, I guess what I'm getting at is, why should that glitch lead to a colossally different outcome when the Pennsylvania law at the time provided a remedy for that, this kind of, I think it was two years at the time, a two-year kind of, you know, make it right process. And so, in one sense, I guess what I'm saying is, even if I'm with you all the way to, you know, we can upset this, we can do everything else like this, didn't Pennsylvania law have the foresight to kind of build in a two-year challenge it or hold your peace? And that two-year statute of limitations applies to irregularities in the assessment or process. This is not an irregularity, and that's what Fisk v. Corey holds. So, you have a long line of Pennsylvania Supreme Court precedent reversing tax sales, holding that they had no effect, 50, 25, even in the case of Albert v. Lehigh Coal Company, that they've reversed. The Pennsylvania Supreme Court in 1968 held that a tax sale from 98 years earlier did not pass title. It does? Yes, it does. Because? Oh, in that case, I have to, I believe. I've got no doubt that there are instances where, just as Judge Phipps has indicated, a quiet title action arises long after the fact, but we're dealing with pretty specific law here. Well, let's drill down to the factual point here, because all of this turns, does it not, on Judge Conner's factual finding that a union and the Central Pennsylvania Labor Company had, quote, otherwise directed, they paid taxes and, quote, otherwise directed the county commissioners to separately assess the land. That's the key factual finding on which all this turns, correct? Not all of this, just the reporting portion of the case. The duties are completely separate. You made the reporting central to your argument here, I thought. It's our alternative grounds for affirmance that even if the court finds that there is no duty for an owner of unsealed lands to pay the tax, you can affirm on the alternative grounds that Judge Conner did make that factual finding. Okay. So his dissent is. . . What's the basis for his determination? As I read it, it appeared to me that the only thing he cites is the fact that union and CPLC actually paid taxes on the unseated land. Is there something else? There's plenty of other evidence. So I kind of have to take you a little bit through a story here, but interrupt me if I'm getting too far afield. But prior to Procter & Hill acquiring the lands, it was all owned by Schrader Land Company, and it was a big swath of land. They conveyed it to Procter & Hill, and then when Procter & Hill conveyed to Union Tanning, they, within that deed, conveyed certain bark rights on a few of the tracts, but otherwise held on to the surface and the subsurface of those tracts, along with the subsurface reservation. So when you go through the change in the assessment books, you have these township assessment books, and they list the warrant lands, and they show the change in ownership from Schrader to Procter & Hill to Union Tanning, and then those reserve tracts that didn't, the surface didn't get conveyed, only the bark rights got conveyed to CPLC, those then are assessed to Procter & Hill following the 1894 deed. And then, and in those books, it clearly says these lands are being assessed to Union Tanning Company. Subsequent years, these lands are being assessed to the Central Pennsylvania Lumber Company. And that identification of the owner in those books to us is a clear indication, as Judge Connor found, that reporting did occur. That, I'm not sure I'm following you. It shows that ownership changed, but how does it show that there was some reporting about a separation of subsurface and surface rights? How does he get to that, other than the fact that they paid taxes and they transferred, and there was some transfer of title? Well, two pieces there is one that also the Procter & Hill, it's, you can infer from the fact that the reserved estates from Procter & Hill were now being assessed directly to Procter & Hill. That the county was aware of what tracts, how that was divided. And under the act... Hold on, because you lost me. I want to respect the district court's fact-finding, unless it's clearly erroneous. And I had trouble following the judge's inference, because it looked like the inference was made from the fact that taxes were paid, and then a statement that it was, that CPLC, quote, otherwise directed the county commissioners to separately assess. And I didn't see any place where there was evidence in the record that they otherwise directed. I saw that they paid taxes. I didn't see any place where they, quote, otherwise directed. And from the mere fact that you paid taxes, that doesn't indicate to me in any fashion that you have notified the commissioners of a separation of subsurface and surface rights. It just doesn't follow. I don't get the logical stuff. I don't disagree with you on the paying taxes, and I'm not referring to that component. I'm talking about the assessment books that identify the owner and say, these lands are being assessed to CPLC. So the county was clearly informed of who owned those lands. They identified the owner. And how does that tell the county there's a separation of subsurface and surface rights? From the Act of 1806, the duty to report the severance. So CPLC — Don't go there, because now you're talking about what the law is and the duty. You're back to your primary argument. Stick with me on your backup argument. Where's the fact that he could rely on to say, to infer, aha, they told the county commissioner? Because if you can't point me to one, then I guess what you're telling me is, yeah, we'd rather stick with our primary argument, because our backup argument isn't that good, because there isn't a foundation for what he said, and it's clearly erroneous. I think there is a foundation for all these facts, but the Act of 1806 implies it has to go into — Don't tell me about 1806. If you want to talk about that in a minute, okay. But we're kind of short on time, and that's why I'm cutting you off. I apologize. If we had lots more time, I'd let you tell me more about the 1806 Act. But I really want to hear about the record, not about the acts of the legislature, the record. Can you point us to anything in the record that indicates that the county commissioners were, quote, otherwise directed by the Central Pennsylvania Labor Company that there was a separation of surface and subsurface rights? And if you can't, that's okay. Just say, well, I can't do it, or, you know, I'd like to do it later, or something like that, because I didn't see it, and I'm looking for it, and if you can't help me with it, that's all right. I just need to know whether you can or you can't. So, I mean, the district court refers to the defendants' exhibits 1, 2, 3, 4, 3, 8, and 47, which are the assessment books. So in reviewing those assessment books, it made the determination that CPLC reported its interests. Now, I know you're not going to appreciate what I have to say, but they had the obligation to accurately report their ownership interests. Okay, so there's nothing there, but they had a duty. So we're back to duty in the 1806 Act. Okay, good enough. I got you. No, I got you. I understand your argument. And I would just like to tie this back, because I think what Herder-Spring teaches is very important, that the duty fell on CPLC to report its ownership interests. And if they breached that duty, if they failed to accurately report that the severance occurred, that they only owned the surface estate, then the assessor would assess the whole, but then they would be stopped from purchasing the whole, because it's their duty. It's their duty that they breached that led to the assessment of the whole. And how can they then benefit from that? That seems to be what Powell says, but Herder-Spring, as forcefully argued by the other side, also seems to say, well, you've got a period of time within which to address that, and it's a statutory limitation, and you could have brought it within two years, and you didn't do it. And this is not any different from any other area of the law, where people can bring their rights within a specified period of time, and if they don't, they lose them. That's the gist of the argument being made to us. Why should we disregard it? Because the factual finding of reporting, the Procter & Hill heirs understanding that their interests are protected, that the assessors have the obligation to assess just the surface estate, that this tax sale does not encompass it, there's reliance there, so there's nothing for them to challenge within that two-year period. And the issue of the agent purchasing, or the owner purchasing, that is not an irregularity under the statute. That is nothing that would be covered by that two-year period, because that purchase operates as a payment of the tax. So there's nothing ñ how is an agent purchasing an irregularity under the Act of 1815? It's not. It simply is not. Should we let the state of Pennsylvania decide this issue rather than a federal court? Well, the Gain Commission is the party who brought this case into federal court. They filed this action in 2012, and we've gone through the process. We've had the Bellwether trial, and we've had a decision from the district court that thoroughly reviewed the case law and made a determination. So this case is the furthest along. It's properly poised. And this court and every federal court frequently applies decisions under its diversity jurisdiction that rely on making a determination of what state law is. But at the same time, we are reluctant to second-guess the Supreme Court of the ñ I should say the Commonwealth of Pennsylvania. And, you know, frankly, there were years when we were not impressed by the Pennsylvania Supreme Court, but I think they have pulled their act together now and that they very well can establish what is the law of Pennsylvania. And who are we to say differently? Well, and let me just say we have the highest respect for them. And this is an instance where, adding on to what Judge Roth just said, the very highest respect for these jurists. This is their law, and this is a case in which ñ not directly, but by implication ñ thousands of millions of dollars are at stake. No? I mean, you're talking about how the Marsalis Shale rights are going to be treated. Why would we take something of that magnitude out of the hands of the Pennsylvania Supreme Court? That's a good, you know ñ I think because ñ I'm not saying we won't, because you're right. It's been teed up. The Commonwealth itself chose to do this. They made the decision to come to federal court. They can ñ you know, they're not all that well positioned to say, oh, no, oh, no. But just as a matter of comity, does it make more sense to wait? Do you have as much faith in them as we do, or having earned a win, do you just want to keep it? Well, I have faith in the judges of this court making the correct decision. As far as, you know, if this court feels any obligation to defer to the Pennsylvania Supreme Court, then I would be in favor of certification from this court to the Pennsylvania Supreme Court. I don't think that's necessary here, though. I think we have ñ this is not an emerging area of law. These are historical cases we're evaluating, and there's nothing truly novel about it. We have the cases that discuss it, and I ñ we have the Act of June 6, 1887. I know that was not a highlight of our discussion here, but, you know, it's something else to say, well, maybe the court didn't mean what it said when it was talking about personal liability, but here you have statutory language that imposes a duty. And I think it's really critical ñ I just want to point this out ñ is that in 1920, the Game Commission purchased this property subject to the Procter and Hill Reservation. It's only 100 years later that they changed their mind as to what that ñ what the effect of it is. But if that was a nullity back then, I mean, that was conditional, right? The precise language was it's subject to whatever they may have, right? If they had nothing, then they got nothing. It says subject to the oil, gas, and mineral reservation. It doesn't say may. There's no possibilities in that language. It's subject to the reservation of the oil, gas, and minerals as reserved in the 1894 deed from Thomas E. Procter and Jonathan A. Hill to the Union Tandon Company, cited at deed book 24, page 36. But if the title wash was complete, then that couldn't have existed at that point in time. You're making a strong equitable pitch, and you've got an equitable pitch to make. The folks at CPLC were apparently bad actors. That's what it looks like. And it looks like they stuck it to the Thomas E. Procter folks, and they did it deliberately, and that the Game Commission is now happily taking advantage of it, and that there are bad odor lines coming off of all that. You've got a good equitable position. The question isn't whether you've got a good equitable position. It's whether the law of the state of Pennsylvania says, as Mr. Scorinci emphasizes, too bad. Or in the words of the Pennsylvania Supreme Court, it's a harsh rule, but vigilant landowners don't have to worry about it because they can bring their claim within the two-year statute of limitations. That's where we're at, and maybe it's why, you know, the Pennsylvania Supreme Court ought to be the one to weigh that stuff out. But we've got your argument. We understand it. Thanks very much, Ms. Lyons. Thank you. Your Honor, I just want to make two very quick points. First, this is not a jurisdictional defect. This is an irregularity. I'd point to Williston v. Colquette. That was an under-assessment. The land was 600 acres, and it was assessed for 200. The court said that was a mere irregularity. There's other examples in my brief, such as Ryan v. Bruin. Well, I'm going to ask you a question because we came up with Ms. Lyons. You know, I asked her where she had this, and I sort of caught her unawares. But I'll quote you the language I think is best for them, and I want you to respond to it from her spring. It says at page 369, We agree with the Superior Court's conclusion that if neither the Kellers nor the purchaser of the surface rights in 1899 reported the transfer, then the Center County Commissioners would have assessed and taxed Ellinor-Stitton's warrant in its entirety. In other words, it seems to be saying that reporting is a big deal and that if you don't report, then it gets taxed in the entirety. But if you do report, it's supposed to be taxed as separate estates and that that matters. Not it's a so what, as the Commonwealth seems to say, but that it matters. How do you respond to that language from her spring? Well, it matters in that it is a regularity, and it can be challenged within two years of the tax sale. But it can't wait 120 years. It's a mere regularity. It's not a jurisdictional defect. One case I know that was mentioned was Albert. That's a case where the treasurer mistakenly credited the payment to the wrong property. It's not on point. Your Honor, I know you mentioned her to spring a lot, and I just wanted to, I know you were looking for some language about what the case was about, and I just want to emphasize that the issues in this case, this is on page 361 to 362, the issues in this case turn on whether the taxes assessed and not paid in 1935 were assessed on the Eleanor Seiden's warrant as a whole or merely upon the surface estate. And here there's simply no dispute that this was an assessment of a whole. Okay. Thank you, Your Honor. We thank counsel for the argument. It's helpful. We've got a matter under advisement. We'll call it.